Frank K. Sims, Jr. v. Commissioner.
Sims v. Commissioner
Docket No. 4446-69.
United States Tax Court
T.C. Memo 1971-303; 1971 Tax Ct. Memo LEXIS 33; 30 T.C.M. (CCH) 1295; T.C.M. (RIA) 71303; November 29, 1971, Filed. *33 Business v. nonbusiness bad debt: Loan v. participation in joint venture: Fact finding. - Johns asked Browning and Cohen to obtain a loan for him of $35,000. Browning and Cohen offered petitioner valuable stock options in a corporation owned by Johns for his help in getting the loan. On the strength of petitioner's credit, the Bank of Commerce lent petitioner, Browning, and Cohen as co-makers of a 60-day promissory note $35,000, which in turn was distributed to Johns. Johns could not repay the money within 60 days, and repeated extensions of the note were necessary. To obtain some of these extensions Browning and Cohen granted petitioner further valuable stock options. In 1966, Johns stopped making payments on the loan with $14,500 of the principal unpaid. In the same year, the bank obtained a judgment against petitioner, Browning, and Cohen for $14,500 which petitioner paid. Petitioner was unable to obtain contribution from Browning and Cohen. Held: Petitioner had a nonbusiness bad debt under section 166(d) of $14,500 in 1966. 2. Held, further: Petitioner did not prove that he was entitled to deduct under section 162 any greater amount for repair of an apartment than had been *34 allowed by respondent. 3. Held, further: Petitioner did not prove that the remaining useful life of two apartment buildings was four rather than eight years. Elton B. Taylor, 723 S. Sharon-Amitty Rd; Charlotte, N.C., for the petitioner. Steve C. Horowitz, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined a deficiency of $7,341.92 in petitioner's income tax for 1966. After petitioner's concession with respect to receipt *36 of $124 of dividend income, the three following issues remain: (1) whether a debt which became worthless in 1966 was a nonbusiness bad debt as defined by section 166(d), [1](2) whether renovation of an apartment building constituted deductible expense or capital expenditure; and (3) whether the remaining useful life of two apartment buildings owned by petitioner should be reduced to four years from eight years for purposes of computing depreciation. Findings of Fact Some of the facts have been stipulated and they are so found. Petitioner is Frank K. Sims, Jr., whose legal residence at all relevant times was Charlotte, N.C. Petitioner filed his personal income tax return for 1966 with the district director of internal revenue, Greensboro, N.C.
Prior to his retirement in June 1965, petitioner was actively engaged in the practice of law. In 1966 petitioner did not practice his profession. During 1961, Howard M. Browning (hereafter Browning) was engaged as a sole proprietor in the business of providing management and financial consulting services to business enterprises. *37 During 1961, Leslie B. Cohen (hereafter Cohen) was engaged either as a sole proprietor or through his corporation in the business of providing management and financial consulting services to business enterprises. From time to time Browning and Cohen pursued business ventures together. Both of them had had business dealings with petitioner. During 1961, A. F. Johns (hereafter Johns) was president of General Utilities and Industries, Inc. (hereafter General Utilities), a Utah utility corporation. Johns offered Browning and Cohen an option to 1296 acquire 5,000 shares of General Utilities and Industries, Inc., stock at $2 below the existing market price in consideration of their assistance in obtaining a $35,000 loan. Browning and Cohen were unable to obtain the loan for Johns on the strength of their own credit; therefore, they sought the aid of petitioner who had a line of credit with the Bank of Commerce, Charlotte, N.C. Browning, Cohen, and petitioner agreed that petitioner was to receive options to purchase 1,667 shares of General Utilities stock at $2 below existing market price from Browning and Cohen for his assistance in obtaining the loan for Johns. Pursuant to their *38 agreement, on July 25, 1961, Browning, Cohen, and petitioner executed a promissory note binding themselves jointly and severally liable to the Bank of Commerce for a loan in the principal amount of $35,000. At that time it was anticipated that Johns would be able to repay the loan in 60 days. The loan was secured by 10,000 shares of General Utilities stock which was pledged as collateral by Johns. At this time the stock had a fair market value of $6 per share. The bank issued a cashier's check in the amount of $34,650 representing the proceeds of the loan to Browning who in turn distributed the entire proceeds to Johns. Johns did not execute a promissory note to either the bank or to Browning, Cohen or petitioner, whether jointly or severally, evidencing his obligation to repay the loan. On September 25, 1961, petitioner exercised his option and acquired 1,667 shares of General Utilities stock from Johns at a total cost of $6,251.25. The 1,667 shares of General Utilities stock acquired from Johns was sold by petitioner in 1961 at a net gain of $2,703.52, as shown in the following schedule: Shares
Market
Date Sold
Sold
Price
Sales Price
Cost
Commission
Net Gain
9-26-61
800
$6.00
$4,800.00
$3,000.00
$121.92
$1,678.08
9-26-61
200
6.125
1,225.00
750.00
30.74
444.26
10-16-61
667
4.75
3,168.25
2,501.25
85.82
581.18
*39 The loan was renewed about every 60 days after the initial period. In consideration of petitioner's assistance in obtaining some of the renewals he obtained further options from Browning and Cohen to purchase General Industries stock at $2 or more below existing fair market price. Petitioner made substantial profits from the purchase of the stock at the option price and its resale at market price. The market price of General Industries stock declined and Johns was required to pledge an additional 5,000 shares of stock as security for the bank loan on February 8, 1962. At that time the stock had a fair market value of a little over $3. Johns did make payments on the loan and by the time of the last renewal had reduced the outstanding balance to $14,500. On each occasion that petitioner obtained a renewal of the loan, except the last renewal on April 20, 1965, petitioner executed a promissory note jointly with Browning and Cohen for the amount then due. Petitioner through the mistake of a bank employee signed the last renewal note as an endorser. In July 1964 the Securities and Exchange Commission ruled that the Bank of Commerce had to relinquish the 15,000 shares of General *40 Utilities stock it held as collateral for the loan because the stock was restricted. On September 16, 1965, the Bank of Commerce instituted suit in the Superior Court of Mecklenburg County against petitioner, Browning, and Cohen to collect on the promissory note which was in default. The outstanding balance due on the note at the time was $14,500. On April 21, 1966, the Bank of Commerce obtained a judgment against petitioner, Browning, and Cohen jointly and severally as makers of the note. On April 21, 1966, petitioner paid the judgment in the total amount of $15,320, consisting of principal $14,500; interest $797.50, and court costs $22.50. On April 22, 1966, petitioner, pursuant to North Carolina General Statutes 1-240, transferred and assigned the judgment to his attorney as trustee. No payment was ever received from Browning and Cohen with regard to their shares of the judgment. The parties agree that this indebtedness due petitioner from Browning and Cohen became worthless during the taxable year 1966. 1297 On May 9, 1954, petitioner acquired an apartment building located at 706 North Davidson Street, Charlotte, N.C. The building was of frame construction and was *41 built in 1940. Petitioner computed depreciation on the building using the straight line method with a useful life of 20 years. The apartment was in a declining neighborhood around which urban renewal programs were taking place. Petitioner's tenants for this building often did not exercise proper care for the building and were destructive. The building was often vandalized. In 1966, an inspection of the apartment building was made by the City of Charlotte Building Department which ordered that certain repairs be made in order to make the apartment conform to minimum housing standards. Petitioner made repairs and renovations in 1966 which cost $4,702.63. These repairs included patching and plastering the walls, modernizing the electrical wiring and installing additional outlets, installing new water heaters, and strengthening the underpinnings of the building. Respondent determined that $3,742.12 of the repair costs were capital expenditures. In 1966 petitioner also owned an apartment building on North Brevard Street in Charlotte, N.C. In that year petitioner was required to make repairs to this apartment similar to those made on the Davidson Street apartment. The Brevard Street *42 apartment was located in a rough neighborhood and suffered from the same problems of vandalism and destructive tenants that affected the Davidson Street property. Under the straight line method of depreciation which petitioner adopted when he purchased the Brevard Street building there were eight years of remaining useful life in 1966. Opinion Johns was president of General Utilities and Industries, Inc. He needed a short-term loan of $35,000 and approached two business consultants, Browning and Cohen, for aid in getting the funds. Johns offered Browning and Cohen options to purchase 5,000 shares of General Utilities stock at $2 below market price in return for obtaining the loan for him. Browning and Cohen were unable to obtain the loan on the strength of their own credit, and they enlisted the aid of petitioner who had a line of credit with the Bank of Commerce. In return for the promise of Browning and Cohen to grant petitioner options to purchase 1,667 of the 5,000 shares of General Utilities stock at $2 below existing market price, petitioner obtained a loan from the Bank of Commerce for $35,000. The proceeds of the loan were paid to Browning who distributed them to Johns. *43 Johns was not able to repay the loan within 60 days, and repeated 60-day extensions were necessary. In order to obtain petitioner's cooperation in obtaining some of the extensions, Browning and Cohen granted petitioner additional options to purchase General Utilities stock at $2 or more below market. By mid-1966 the value of General Utilities stock had fallen appreciably, Johns had stopped making payments on the loan, and the bank had been required, because of a Securities and Exchange Commission ruling, to give up the 15,000 shares of General Utilities stock which had been pledged by Johns as security for the loan. In April 1966, the bank obtained a judgment against petitioner, Browning, and Cohen for the unpaid balance of the loan, $14,500, plus costs. Petitioner paid the judgment and was unable to obtain contribution from Browning and Cohen. The parties agree that the debt of Browning and Cohen to petitioner became worthless in 1966. [2]
*44 Petitioner disputes respondent's determination that the debt which became worthless in 1966 was a nonbusiness bad debt and deductible only as a short-term capital loss under section 166(d). Petitioner also disputes respondent's treatment of certain expenditures to repair an apartment building as capital expenditures and respondent's refusal to permit petitioner to reduce the useful life of this apartment building and another like it from eight years to four years. 1298 Bad Debt Deduction Petitioner's arguments can be distilled into three theories in support of his claim for ordinary loss treatment of his payment of the judgment in 1966: (1) that he contributed $35,000 to a joint venture with Browning and Cohen, the loss of $14,500 of which in 1966 is deductible as a business loss under section 165(c)(1); (2) that the debt was not a nonbusiness debt because he, Browning and Cohen were engaged as joint venturers in the business of lending money in return for profitable stock options; and (3) that the loss is ordinary by virture of section 166(f) because he had guaranteed a debt incurred in the course of the business conducted by Browning and Cohen. We find no merit in any *45 of these claims. There is no doubt that the loss of capital contributed to a partnership is an ordinary loss deductible under section 165 (c)(1). Harry Horner, 35 T.C. 231 (1960); Larry E. Webb, 23 T.C. 1035 (1955). In this case, even if one assumes that petitioner, Browning, and Cohen were partners engaged in business, there was no contribution of capital by petitioner to the venture. Petitioner obtained the loan of $35,000 for Browning who reloaned the money to Johns. Petitioner intended that the money be repaid. In fact, he expected the $35,000 to be repaid within 60 days. These facts clearly indicate that the parties were co-borrowers from the bank and colenders to Johns. Furthermore, there is no indication that petitioner ever intended to make return of the purported contribution dependent upon the success of the undertaking with Browning and Cohen or upon the success of John's business. Because debt rather than business loss is involved in this case, the treatment accorded petitioner's loss in 1966 is determined solely by section 166. Spring City Co. v. Commissioner, 292 U.S. 182 (1934), *46 rehearing denied 292 U.S. 613 (1934). The main thrust of petitioner's argument on brief is that he, Browning and Cohen were engaged in a partnership or joint venture. Consequently, petitioner attempts to explain away the facts that no partnership books were maintained, that no partnership returns were filed, and that there was no sharing of profits and losses in the undertaking. See Hubert M. Luna, 42 T.C. 1067, 1077 (1964). We do not doubt that a partnership may exist for some purposes absent any or all of the traditional criteria for determining partnership status; however, petitioner's arguments do not answer the essential question raised by section 166(d) - whether the debt which became worthless was created in the course of petitioner's business. To recite that the business of the partnership is the business of the partner is not helpful in determining whether the partnership conducted any business which can be imputed to the partner. From the record we find that in arranging for the loan to Johns neither petitioner nor the other two parties was engaged individually or jointly in the conduct of a business. Petitioner makes no claim that he, Browning, *47 and Cohen were in the business of lending money; and, indeed, no such claim could be made upon the making of a single isolated loan. Stuart M. Sales, 37 T.C. 576 (1961). It is also clear that the parties were not in the business of promoting other businesses. They did not participate in any way in Johns' enterprises, and they did not seek to share in Johns' profits. See Whipple v. Commissioner, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858 (1963). Petitioner specifically claims that the partners were in the business of making loans in return for valuable stock options. This is a rather curious claim in view of the fact that petitioner has stipulated that the first grant of options was in the nature of a finder's fee and of the fact that the parties believed that the loan to Johns would be repaid at the end of the initial 60-day period. When the loan was made to Johns, the parties did not anticipate any benefit in addition to the original 5,000 share option. When Johns was unable to repay the loan, he was willing to grant additional options for the use of the money. Therefore, the partners merely received investment profits in the nature *48 of interest; their profits were in no way related to the conduct of any business. It is well established that lending money to obtain investment type profits does not constitute a trade or business. Whipple v. Commissioner, supra. we can dispose of petitioner's last theory - that he was a guarantor of a noncorporate obligation who is entitled to ordinary loss treatment under section 166(f) - with little comment. First, it is clear from the record that petitioner was both 1299 a co-maker of the note to the bank and a co-lender to Johns; he was not a guarantor of an obligation incurred by Browning and Cohen. Second, there is nothing in the record which indicates that lending money to Johns would have been an incident of any business carried on by Browning and Cohen. Accordingly, section 166(f) by its terms cannot apply. Deduction for Repair Expenses Petitioner owned an apartment building on Davidson Street in Charlotte, N.C. (the Davidson Street property). In 1966, the Davidson Street property was inspected by city housing authorities and found to be below minimum standards *49 in several respects. In response to the City's orders, petitioner repaired the building at a cost of $4,702.63, all of which amount he claims to be an expense deductible under section 162. In many instances repairs which would normally be considered ordinary maintenance are in fact capital improvements if they are made in the course of a plan of rehabilitation or renovation. I.M. Cowell, 18 B.T.A. 997, 1002 (1930); United States v. Wehrli, 400 F. 2d 686 (C.A. 10, 1968). In such case the cost of repair is a nondeductible capital expenditure under section 263(a). Stated briefly, the rule for distinguishing between deductible expenses and nondeductible capital expenditures is that the cost of keeping property in ordinary efficient operating condition is deductible while the cost of putting it in such condition is not. Stoeltzing v. Commissioner, 266 F. 2d 374 (C.A. 3, 1959). Petitioner repaired, replaced and renovated items in the building to meet the minimum standards for housing prescribed by the City. Hence, it would appear that his expenditures *50 were for the purpose of putting the apartment in ordinary efficient operating condition. After examination of the work that petitioner had performed, we conclude that the costs of items which might properly be considered deductible expenses (such as patching the plaster and repairing the wiring) does not exceed the amount allowed by respondent as a deduction. Therefore, we sustain respondent's disallowance of $3,742.12 of the claimed deduction. Depreciation In addition to the Davidson Street property, petitioner owned another apartment on North Brevard Street in Charlotte, N.C. The buildings were nearly identical with respect to their physical condition and surrounding neighborhoods. Both were depreciated on the straight line basis and by 1966 had eight years of remaining useful life. In 1966, after making repairs to both buildings, petitioner determined that the apartment buildings had remaining useful lives of only four years because of the deteriorated condition of the neighborhood in which they were located and the absence of responsible tenants. Respondent refused to permit petitioner to reduce the remaining useful lives. Petitioner's expert witness confirmed at trial petitioner's *51 claim that the neighborhoods in which the apartments were located were rapidly deteriorating, that the buildings were potential targets for urban renewal demolition, and that petitioner's tenants were generally destrucive. However, when the witness was asked directly concerning the remaining useful lives of the buildings from facts known to exist in 1966, he replied that the apartments had a useful life of eight years. It is not clear whether the witness was considering the nature of the neighborhood in making the estimation or was giving a general estimate of the useful life of all buildings similar to petitioner's apartment. Petitioner's witness did indicate that his estimate did not take into account the vandalism which petitioner claims shortened the lives of the buildings. We only note that section 165(c)(3) is the proper remedy for vandalism losses rather than section 167. In view of the ambiguity of the evidence offered by petitioner, we do not think that he has carried his burden of proof on this issue. In view of concessions made by the parties, Decision will be entered under Rule 50. 1300 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. At trial respondent argued for the first time that only two-thirds of the $14,500 principal of the judgment paid by petitioner was a bad debt. According to respondent, two-thirds of the amount represented the unpaid contribution of Browning and Cohen to payment of the judgment and the other third was merely repayment of petitioner's share of the bank loan. Respondent did not renew this argument on brief. It is clear from the record that one-third of the amount was owed to petitioner by Johns if it was not owed by Browning and Cohen. In the latter part of 1966, the exact whereabouts of Johns became unknown. There is no doubt that the entire $14,500 was a bad debt of petitioner in 1966.↩