T.C. Summary Opinion 2008-130

UNITED STATES TAX COURT

STEVEN AND MARGUERITE KROFF, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5511-07S.          Filed October 14, 2008.

Steven and Marguerite Kroff, pro se.

Brooke S. Laurie, for respondent.

GOEKE, Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a $16,606 deficiency in petitioners' Federal income tax and a $3,321.20 accuracy-related penalty under section 6662(a) for 2002. The issues for decision are:

(1) Whether petitioners are entitled to claim a deduction for business worthless debts in the amount of $550,317. We hold that they may not, but that they may treat $150,000 of nonbusiness worthless debts as a short-term capital loss;

(2) whether petitioners may claim miscellaneous itemized deductions in an amount above that allowed by respondent. We hold that petitioners may claim $23,776 of miscellaneous itemized deductions related to tax preparation and petitioner Steven Kroff's (petitioner) lending activities;

(3) whether petitioners are liable for an accuracy-related penalty under section 6662. We hold that they are not.

## Background

Some facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference. Petitioners resided in California at the time they filed their petition.

In 2002 petitioner was engaged in rental and lending activities. Petitioner conducted these activities through his sole proprietorship, Professional Service Co. Petitioner spent

approximately 750 hours or less working on his rental activity during 2002.

Respondent sent petitioners a statutory notice of deficiency dated December 5, 2006, for the 2002 tax year.

I.  Business Worthless Debt

On their joint Form 1040, U.S. Individual Income Tax Return, petitioners claimed a loss of $550,317 as "Other income", mostly attributable to business bad debts owed by the following debtors:

| Debtor | Debt |
|---|---|
| Mr. Murray | $90,000 |
| Mr. Bettencourt | 150,000 |
| Mr. Whalen (Whalen I) | 184,440 |
| Mr. Whalen (Whalen II) | 125,975 |
| Total | 550,415 |

The difference between the amount of bad debts and the amount claimed as a loss is attributable to $98 of other income, prizes, awards, etc., that petitioners reported on the same statement on which they reported their business bad debt losses.  Respondent disallowed the entire $550,415 of business bad debt losses and also reduced petitioners' other income by $98.  Petitioners also reported $81,312 of taxable interest income, of which $68,658 was attributable to interest from loans to individuals in 2002.  This was petitioners' most significant source of income for the year.

A. <u>Murray Debt</u>

Petitioner met Mr. Murray through his former employment as an automobile salesman. Petitioner loaned $90,000 to Mr. Murray on or about October 1, 1998. According to the promissory note, Mr. Murray agreed to repay petitioner the entire $90,000 in one lump-sum payment on December 31, 1999, as well as 10-percent interest on the unpaid balance annually commencing on December 31, 1998.

On January 27, 2000, petitioner sent a notice of default to Mr. Murray demanding full payment and all interest. According to the notice of default, Mr. Murray owed $9,000 of interest, plus additional interest accruing from January 1, 2000.

On April 17, 2000, petitioner obtained a judgment against Mr. Murray in the amount of $101,675 in the District Court of Clark County, Nevada. The judgment included the $90,000 principal and $11,675 in interest.

On June 6, 2000, Mr. Murray filed a chapter 7 voluntary petition for bankruptcy. On September 18, 2000, the bankruptcy court issued a discharge of debtor for Mr. Murray.

B. <u>Bettencourt Debt</u>

Petitioner also met Mr. Bettencourt while working as an automobile salesman. Petitioner loaned $150,000 to Mr. Bettencourt in 1997 or 1998. Mr. Bettencourt agreed to repay the principal, plus a fee of $7,500 for services, on July 28, 1999.

Mr. Bettencourt and his wife filed a chapter 7 voluntary petition for bankruptcy on November 7, 2003. The bankruptcy court ordered a discharge of debtor for Mr. Bettencourt and his wife on February 9, 2004.

C. Whalen Debts

Petitioner met Mr. Whalen through a real estate broker. Petitioners claimed a bad business debt deduction of $184,440 attributable to four loans that petitioner made to Mr. Whalen in the following amounts: $107,000 on August 5, 1997; $8,000 on June 1, 1998; $12,000 on September 1, 1998; and $106,400 on January 13, 1999 (Whalen I debt). The annual interest rate on these loans ranged from 16 to 20 percent. Mr. Whalen repaid at least $40,061 of principal on the $107,000 loan as of January 5, 2000. Petitioner was unable to establish to which loans the remaining $8,899 of payments were attributable.

Petitioners also claimed a $125,975 bad business debt attributable to a promissory note Mr. Whalen signed on June 26, 1999, related to petitioner and Mr. Whalen's hay business (Whalen II debt). In 1997 petitioner and Mr. Whalen planned to buy hay in the spring and sell it in the future at a profit. Petitioner paid money to Mr. Whalen and other hay dealers for hay purchased in 1997 as well as equipment to be used in the hay business. Petitioner claims he paid approximately $286,912.28 for hay and $39,766.80 for other items related to the hay business. However,

the hay petitioner purchased in 1997 was destroyed by a flood, making it unusable for resale. On June 26, 1999, petitioner and Mr. Whalen signed a promissory note whereby Mr. Whalen agreed to pay petitioner $125,975.27 for the destroyed hay on March 1, 2000, plus monthly interest payments. By March 20, 2000, Mr. Whalen owed petitioner $136,031 on this note.

On March 20, 2000, Mr. Whalen filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Mr. Whalen's bankruptcy estate objected to petitioner's claim in the amount of $136,031 for the Whalen II debt. The bankruptcy estate argued that petitioner did not provide Mr. Whalen with any additional consideration for the promissory note but required Mr. Whalen to sign the note by threatening to enforce an earlier loan not before the Court.

On March 14, 2001, the bankruptcy court ordered a discharge of debtor for Mr. Whalen.

The bankruptcy estate brought a suit against petitioner alleging that: (1) Petitioner's loans to Mr. Whalen were usurious; (2) petitioner had received fraudulent conveyances; (3) the Whalen II loan was fraudulent; and (4) petitioner deliberately defaulted on a bank loan that petitioner and/or Mr. Whalen had taken out as part of the hay business. The bankruptcy estate estimated that $63,319 of the payments from Mr. Whalen to petitioner were fraudulent conveyances which the bankruptcy

estate would attempt to recover. Because the bankruptcy estate was forced to repay a loan from South Valley National Bank (SVNB) that petitioner failed to pay related to the hay business, the bankruptcy estate would be subrogated to the bank's rights against petitioner, which was estimated to be about $60,000.

On June 5, 2001, petitioner and the bankruptcy estate entered into an agreement whereby petitioner would cancel the four promissory notes included in the Whalen I debt and pay Mr. Whalen's bankruptcy estate $40,000 for release of the usury and attorneys' fee claims. According to a joint motion filed with the bankruptcy court for approval of the settlement agreement, at the time of the settlement Mr. Whalen had repaid $114,792 of the $233,400 that he borrowed from petitioner. Mr. Whalen repaid $60,169 of this amount within a year of filing for bankruptcy. Petitioner paid the bankruptcy estate $40,000 on August 21, 2001, to settle the claims for usury and the related attorneys' fees. Petitioner paid an additional $87,538.05 to the bankruptcy estate on or before November 19, 2002, in connection with the subrogation claim and related attorneys' fees.

II. Miscellaneous Itemized Deductions

Petitioners claimed on their Schedule A, Itemized Deductions, $108,045 of miscellaneous itemized deductions. In the notice of deficiency, respondent disallowed $101,869 of the claimed miscellaneous itemized deductions. Respondent did not

specify which expenses were included in the $6,176 deduction that he allowed.

Petitioners deducted a $25,000 passive activity loss on their Schedule E, Supplemental Income and Loss, for 2002, which is the maximum amount allowed for passive rental real estate activities under section 469(a) and (i).

Petitioners claimed $300 of tax preparation expenses and $1,263 of depreciation expenses.  In addition, petitioners claimed as expenses related to lending activities:   (1) $2,447 of dues and subscription expenses; (2) $3,335 of office supplies and postage expenses; (3) $3,573 of telephone expenses; (4) $1,789 of furniture expenses; and (5) $87,538 as expenses incurred in connection with the settlement of Mr. Whalen's bankruptcy estate's subrogation claim.  Petitioners also claimed $7,718 of automobile expenses related to rental activities.

III.  Computational Adjustments

If we sustain respondent's adjustments, there may be corresponding computational adjustments to petitioner's Social Security income, medical expense deduction, and charitable contribution deduction.  These adjustments will be addressed in a Rule 155 computation and need not be discussed in this opinion.

IV.  Accuracy-Related Penalty

Respondent determined that petitioner was liable for an accuracy-related penalty of $3,321.20 under section 6662.

## Discussion

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to the deductions claimed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners do not allege, nor do we find, that section 7491(a) applies.

## I. Business Worthless Debt

Petitioners claim that they are entitled to a deduction of $550,317 for business worthless debt.

Section 166(a) allows a deduction for any business debt that becomes worthless during the taxable year. A nonbusiness debt of an individual that becomes wholly worthless during the year is not deductible under section 166(a) but is instead treated as a short-term capital loss. Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs.

A business debt is either (1) a debt created or acquired in connection with a trade or business of the taxpayer, or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Sec. 166(d)(2).

Respondent argues that petitioners are not entitled to a business bad debt deduction because they have not shown that: (1) A debt was owed; (2) the debts became worthless in 2002; (3) the debts were business debts; or (4) petitioners are entitled to claim the face value of the promissory notes as a deduction.

In order to prove that petitioners are entitled to a deduction under section 166(a), they must show that the deductions relate to a bona fide debt, which is defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.

We have found that the Murray, Bettencourt, and Whalen I debts were valid debts. However, we find that a debtor-creditor relationship did not exist between petitioner and Mr. Whalen at the time that the Whalen II promissory note was signed. There is no evidence that petitioner loaned Mr. Whalen $125,975 with the intent that Mr. Whalen would repay that amount plus interest. The evidence shows that petitioner and Mr. Whalen were in a business relationship in order to make a profit from an investment in hay, and petitioner invested money in the business to purchase hay and supplies to be used in that business. Petitioner intended to earn a profit from sales of hay, not from interest on a loan. Mr. Whalen signed the promissory note 2 years after the hay had been purchased and destroyed, suggesting that Mr. Whalen did not sign the promissory note for the purpose of receiving a loan. Therefore, we find that petitioner is not entitled to a bad debt deduction for the Whalen II debt.

We find that the Bettencourt debt became worthless in 2002. Debts are worthless when the taxpayer has no reasonable

expectation of repayment.  Crown v. Commissioner, 77 T.C. 582, 598 (1981); Egan v. Commissioner, T.C. Memo. 2005-234.  While Mr. Bettencourt's debt was not discharged until 2004, the fact that this event confirmed the debt's worthlessness does not mean that the debt became worthless in that year.  See sec. 1.166-2(c)(2), Income Tax Regs.  Petitioner credibly testified that it became clear in 2002 that Mr. Bettencourt would not be able to repay the loans, and respondent has offered no evidence that petitioner has or could have taken deductions for the worthless debts in any other year.  Therefore, petitioner has satisfied his burden of proof that the Bettencourt debt became worthless in 2002.

However, we find that the Murray debt became worthless in 2000 when it was discharged by the bankruptcy court.  While petitioner argues that he still believed that he would be able to collect the debt because of assurances from Mr. Murray, we do not find this belief to be reasonable because Mr. Murray had no legal obligation to repay the debt.  As to the Whalen I loan, we find that those notes became worthless in 2001 when petitioner signed a settlement agreement with Mr. Whalen's bankruptcy estate and agreed to cancel the notes.  Considering the bankruptcy estate's claims against petitioner, it was unreasonable for petitioner to believe that he could collect on those debts after that date.

Respondent next argues that the debts were nonbusiness debts because petitioner was not in the trade or business of loaning

money to individuals or that the debts were otherwise incurred in petitioner's trade or business.

A taxpayer may deduct bad debts as business losses if the taxpayer's activities in making loans are so extensive as to constitute a business. Sales v. Commissioner, 37 T.C. 576, 580 (1961); Barish v. Commissioner, 31 T.C. 1280, 1286 (1959). Factors we have considered to determine whether a taxpayer is in the business of lending money include: (1) The total number of loans made; (2) the time period over which the loans were made; (3) the adequacy and nature of the taxpayer's records; (4) the amount of time devoted to the lending activity; (5) whether the taxpayer actively sought out lending business; (6) whether the taxpayer advertised; (7) whether the taxpayer maintained a separate office for the business; (8) whether the taxpayer maintained separate books and accounts for the business and tracked profit and loss; (9) the taxpayer's general reputation in the community as a lender; (10) and the relationship of the debtors to the taxpayer-lender. Serot v. Commissioner, T.C. Memo. 1994-532, affd. without published opinion 74 F.3d 1227 (3d Cir. 1995); Ruppel v. Commissioner, T.C. Memo. 1987-248.

Excluding the Whalen II debt, petitioner provided evidence of making six loans totaling $424,440 between 1997 and January 13, 1999. Petitioner also earned nearly $70,000 of interest from loans made to individuals in 2002. However, even if these loans

were sufficient to indicate that petitioner was in the trade or business of making loans, these factors alone are not sufficient to support a finding that petitioner was in the business of making loans because the remaining factors weigh against such a finding. See Scallen v. Commissioner, T.C. Memo. 2002-294.

Petitioner provided no evidence as to how much time he spent engaged in lending activities. Petitioner provided no evidence that he actively sought lending business or advertised; to the contrary, petitioner testified that he met Mr. Murray and Mr. Bettencourt through an automobile business that he was involved in and Mr. Whalen through a real estate broker. Petitioner testified that he met the other people to whom he loaned money through business connections unrelated to a lending business. Therefore, petitioner generally did not make loans to people who sought him out for his lending services. Petitioner provided no evidence that he maintained an office for a lending business or maintained any records for the business other than the promissory notes. When asked whether it was common for petitioner to lend money to individuals, petitioner replied "I've lent money to individuals before, yes." This indicates that petitioner commonly loaned money to individuals he knew through his other business dealings, but not that he was actively engaged in the trade or business of loaning money. Therefore, we find that petitioners are not entitled to a business worthless debt

deduction under section 166(a).  However, even if petitioner was not in the business of making loans, petitioners may be able to treat the bad debts as short-term capital losses.

Respondent argues that petitioner is not entitled to any deductions related to the loans because petitioner has not satisfied his burden of showing how much money petitioner actually loaned or what payments he received from the notes. Secs. 166(b), 1011.

Petitioner credibly testified that he in fact loaned the amounts shown on the promissory notes.  Petitioner also credibly testified that he received no payments on the Bettencourt loan. Therefore, we find that petitioner provided sufficient evidence to prove that petitioners were owed the face value of the Bettencourt loan and may treat it as a short-term capital loss under section 166(d).

II.  Miscellaneous Itemized Deductions

Section 162(a) allows deductions for ordinary and necessary expenses of carrying on a trade or business.  Section 212(1) allows individual taxpayers to deduct ordinary and necessary expenses paid for the production or collection of income.  No deductions are allowed for personal, living, or family expenses except as otherwise allowed.  Sec. 262(a).  Because petitioners deducted a $25,000 passive activity loss for their rental activities, the maximum allowed by section 469(i), additional

deductions attributable to petitioner's rental activities are not allowed for the year in issue but may be carried over to the next year under section 469(b).

Petitioner claims that all of the miscellaneous itemized deductions relate to petitioner's lending activities except for the deductions for tax preparation and depreciation and the deductions for vehicle expenses, which are related to his rental activities. In the notice of deficiency respondent allowed $6,176 as a deduction for miscellaneous itemized deductions. Respondent has offered no evidence related to the $6,176. Therefore, petitioners are entitled to a deduction of $6,176 in addition to the deductions for which they have satisfied their burden of proof. See Rule 142(a).

A. Tax Preparation Deduction

Petitioners claimed $300 for tax preparation expenses. As evidence, petitioner credibly testified that he paid his accountant $300 and provided a copy of the canceled check. We find that petitioners have satisfied this burden of proof and are entitled to the deduction.

B. Depreciation

Petitioners claimed $1,263 in depreciation expenses. However, petitioners have not provided any evidence to explain or substantiate this deduction. Therefore, petitioners are not entitled to this deduction.

C. Dues and Subscription Expenses

Petitioners claimed $2,447 of dues and subscription expenses as business loan expenses. Petitioners provided no explanation as to how these expenses are connected to petitioner's lending activities. Petitioners submitted copies of a number of checks made out to Direct TV, a travel club, and various illegible payees. These amounts appear to have been paid for personal expenses and petitioners are therefore not entitled to those deductions. See sec. 262(a).

D. Office Supplies and Postage

Petitioners claimed $3,335 of office supply and postage expenses as business loan expenses. Petitioners provided copies of checks written to various payees such as Costco, Orkin, Sees Candies, Bank of America, and moving companies; receipts from Fry's Electronics; credit card statements; and a list of cash expenses. However, petitioners have not established that these expenses were paid in connection with petitioner's lending activities instead of personal activities. Petitioner has not established that he maintained an office for his lending activities.

However, petitioner has shown that he paid substantial office supply and postage expenses, some of which are related to his lending activity during 2002. Therefore, under Cohan v. Commissioner, 39 F.2d 540, 543-554 (2d Cir. 1930), we estimate

that petitioner paid $300 of office supply and postage expenses related to his lending business.

E.   Telephone Expenses

Petitioners claimed $3,573 of telephone expenses as business loan expenses.  As evidence, petitioner provided copies of checks made out to various telephone companies and copies of monthly statements from the telephone companies.

Section 262(a) and (b) provides that any charge for basic local telephone service with respect to the first telephone line provided to any residence of the taxpayer shall be treated as a nondeductible personal expense.  Petitioners have not established whether any of the telephone expenses relate to the first telephone line at their residence.  Furthermore, section 274(d) provides that no deduction shall be allowed with respect to any listed property, including cellular telephones and similar telecommunications equipment, see sec. 280F(d)(4)(A)(v), unless the taxpayer substantiates, inter alia, the business use of the property.  Petitioners have not provided any evidence that the telephone expenses were paid for a business use.  Therefore, petitioners are not entitled to this deduction.

F.   Automobile Expenses

Petitioners claimed $7,718 of automobile expenses as business loan expenses.  As evidence, petitioners provided a handwritten log that indicates they paid $205.24 for bridge tolls

and parking, $3,075.10 for gas, and $276.29 for other automobile expenses, and a daily calendar listing mileage driven to rental properties. The daily calendar shows that in 2002 petitioner traveled 14,637 miles between his home and his rental properties in Sacramento, California, and 1,776 miles between his home and Watsonville, California.

Automobiles are listed property under section 280F(d)(4)(A)(i). Taxpayers may also use the standard mileage rate to calculate their business expense mileage deduction if they substantiate the business purpose of the travel and the amount of mileage. Sec. 1.274-5(j)(2), Income Tax Regs. In 2002 the standard mileage rate was 36.5 cents per mile for business use. Rev. Proc. 2001-54, sec. 5, 2001-2 C.B. 530, 531.

There is no indication that expenses listed on the cash expenditure log and receipts represent expenses paid for petitioner's business activities. However, the daily calendar lists the dates that petitioner traveled to his rental properties and provides the mileage for each trip. Petitioner corroborated the information on the calendar by credibly testifying at trial that he drove to his rental properties on the days indicated in the calendar and that the mileage was accurate. Therefore, we find that petitioners are eligible for a deduction of $5,990.75 for business mileage related to petitioner's rental activities. However, as discussed above, petitioner is limited to a loss of

$25,000 from rental activities under section 469 and petitioner has already been allowed that amount. Therefore, petitioner may not deduct additional mileage in 2002 but may carry this deduction forward to the next taxable year. Sec. 469(b).

G. Furniture Expenses

Petitioners claimed $1,789 of furniture expenses as business loan expenses. Petitioners provided no evidence to substantiate these expenses and have not shown that these expenses are related to petitioner's loan activity. The expenses therefore are not deductible.

H. Jeffrey Whalen Loan Expenses

Petitioners claimed $87,538 as expenses incurred in connection with the settlement of the suit with Mr. Whalen's bankruptcy estate as business loan expenses. As evidence, petitioner provided: (1) The bankruptcy estate's cash receipts and disbursements record, indicating a receipt from petitioner of $87,538.05 on November 19, 2002, under the label "PAYMENT/JUDGMENT", and a receipt from petitioner of $40,000 on August 21, 2001, under the label "Claim"; (2) a letter from the attorneys for the bankruptcy estate confirming receipt of $40,000 on or about August 21, 2001, and $17,000 on or about November 19, 2002, for an award of attorney's fees under the settlement on the subrogation claim; and (3) a copy of a check dated November 30, 2001, for $63,137.85 made out to SVNB.

Petitioner testified that the $87,538 claimed includes the $63,137.85 check paid to SVNB and legal fees.  Because petitioner paid $63,137.85 in 2001, petitioner may not deduct that amount in 2002.  We find that petitioner has satisfied his burden of proving that he paid $17,000 in legal fees related to his hay investment in 2002 and may deduct that amount on his Schedule A.  However, petitioners have not accounted for the remaining $7,401 or provided sufficient evidence to prove that it was paid in 2002 and therefore they may not deduct that amount.

III.  Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662.  Section 6662(a) and (b)(1) and (2) provides a 20-percent penalty on the portion of the underpayment of tax attributable to a substantial understatement of income tax, negligence, or disregard of rules and regulations.

Section 7491(c) places the burden of production on the Commissioner to present sufficient evidence that the imposition of a particular addition to tax is appropriate.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his burden of production, the burden of proof shifts to the taxpayer to provide evidence sufficient to negate the appropriateness of the penalty.  Id.

Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title" and disregard includes any "careless, reckless, or intentional disregard."  Sec. 6662(c).

There is a substantial understatement of an individual's income tax if the amount of the understatement of the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000.  Sec. 6662(d)(1)(A).  The amount of the understatement may be reduced in some circumstances if there is substantial authority for the treatment of the item or if the taxpayer discloses the facts affecting the treatment and it has a reasonable basis.  Sec. 6662(d)(2)(B).

The penalty does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c).

We find that regardless of whether respondent has satisfied his burden of production, the penalty does not apply.  Petitioner made a sufficient amount of loans to individuals that a reasonable person could believe he was in the business of making loans, and we find that petitioner's belief that he was in such a business, although erroneous, was made in good faith. Furthermore, petitioners maintained many records of their itemized deductions.  While their records were insufficient to

substantiate many of their claimed deductions, they made a reasonable effort and acted in good faith in making their claims. Therefore, the Court is satisfied that the section 6662(a) accuracy-related penalty should not be imposed.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.